IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Criminal Action No. **10-cr-00132-JLK**
**10-cr-00254-JLK**
**10-cr-00379-JLK**

**UNITED STATES OF AMERICA,**
            Plaintiff,
v.

**1. JAY STEWART DEVAUGHN,**
            Defendant.

---

MEMORANDUM OPINION AND ORDER  RE: SENTENCING

---

**Kane, J.**

### *The Facts of the Crimes*

On September 10, 2009, the White House mail facility in Washington, D.C. intercepted a letter addressed to "President Barack Obama, The White House, 1600 Pennsylvania Street, Washington DC 20500."  Although mailed by the defendant, Jay Stewart Devaughn, the letter bore the return address of Nathan Karber, a Denver area doctor.  Dr. Karber had treated the defendant on a past emergency room visit.  The letter stated as follows: "Dear Sambo: I am an Emergency Room Physician in Denver, and I believe that your so called health care 'reform' is a fucking joke. You are going to take away my livelihood and double my workload. Have you heard of anthrax??? Get a whiff of this Sambo."  The letter was signed with Dr. Karber's first name.  Enclosed with the letter was a plastic bag containing white powder.  The Secret Service handled the letter under standard protocol as if it contained anthrax or some other harmful substance.

The defendant mailed similar letters containing white powdery substances to Colorado Representatives Diana DeGette and Mike Coffman, each bearing the return address of and purportedly signed by Nathan Karber.  Both letters referred to health care reform and urged the reader to "Take a whiff of [the white powdery substance] and see how it feels!!!" The letters were processed by authorities as if they contained anthrax or some other harmful substance.

The defendant was not yet finished, however.  He mailed similar letters to Colorado Senators Mark Udall and Michael Bennett, this time using the name and address of David Cooley, a man married to Dr. Yvonne Reid, a Denver area physician. As had Dr. Karber, Dr. Reid had provided medical treatment to the defendant in the past.  Again, each letter contained a powdery white substance, referred to health care reform, and urged the reader to "Take a whiff." Emergency personnel responded, believing the white powder was anthrax or some other harmful substance.

The defendant mailed similar letters to the Argentine Consulates in New York City and Los Angeles using Dr. Reid's name and address.  Each letter contained references to unavenged deaths caused by the Argentinian government and contained white powdery substances along with death threats.  Once again, emergency personnel responded believing the white powder was anthrax or some other harmful substance.

In separate but entirely familiar incidents, the defendant sent letters to the Alabama offices of Senators Jeff Sessions and Richard Shelby, and Representative Mike Rogers containing white powdery substances claimed to be anthrax.  These letters used the name and address of Patricia and Kelly Tolbert, the defendant's high school trigonometry teacher and her

daughter.  Upon receiving these letters, emergency personnel responded believing the white powder was indeed anthrax.

The defendant's seemingly sporadic, haphazard behavior was anything but.  The investigation into the instant offenses revealed that they were part of a coordinated campaign of harassment which had spanned many years.

After being contacted by investigators, Mr. Cooley denied any involvement with the letters and further advised investigators that his wife, Yvonne Reid, had recently received two threatening voice mails.  The first voice mail was received on October 26, 2009, and stated as follows: "Hey Yvonne.  You remember me. I was your patient in Indiana.  You took me off my medication and told me to go to an emergency room.  You stupid puta.  You sick bitch.  I know where you and David live [address redacted by the court].  I'm gonna blow both of your brains out."  The second voice mail was received on November 8, 2009.  In broken Spanish, the caller asked something similar to, "Como quiere morir puta?"  The English translation is "How do you want to die, whore?"  On December 29, 2009, investigators interviewed Dr. Yvonne Reid, who is employed as a medical doctor and psychiatrist at Fort Logan Mental Hospital.  During the interview, Dr. Reid related that she also received hang-ups and that the threats caused her to be "very scared." She took "extra precautions" in her daily activities and only left the house to go to work and church.

On November 25, 2009, investigators located and contacted Nathan Karber, an emergency room doctor at Exempla Lutheran Hospital in Wheat Ridge, Colorado.  He also denied sending any letters containing white powder.  He further advised that he and his wife, Jill,

had been receiving harassing letters since February 2008.  Discovery materials reflect the following threatening and harassing communications sent to the Karbers by the defendant.

On February 14, 2008, Nathan Karber received a letter that contained a magazine printout of a homosexual image with block lettering that read, "Gay."  On February 15, 2008, a second letter arrived at the Karber residence addressed to Jill Karber.  The letter contained a picture of a male and female having sexual intercourse as the male stabbed the female in the chest. Underneath the image read, "Jill Karber RIP."  The same day, the Karbers filed a police report with the Denver Police Department.  On February 25, 2008, a third letter arrived by mail at the Karber residence.  This letter contained graphic homosexual images with the message, "Does Jill know you like this?"  The Denver police department's response was ineffectual.

On March 27, 2008, Dr. Karber received a mailing at his place of employment that contained a photo of two homosexual males fondling each other.  A photograph of Dr. Karber's face had been super imposed over one of the males depicted in the image and contained a typed death threat.  On April 3, 2008, Dr. Karber's supervisor received an anonymous letter from within the hospital, accusing a hospital employee of sending the threatening letters to Dr. Karber. On April 13, 2008, the defendant posted a sexually explicit ad on Craigslist, posing Dr. Karber as the author.  He mailed a copy of this posting to Jill Karber and to several of the Karbers' neighbors.  Finally, on January 13, 2010, Jill Karber received a letter at the store she owns and operates.  The letter contained a printed web page of www.ratemds.com.  The printed pages were of Nathan Karber's rating sheet, which contained several negative posts.  The local police department's response was equally ineffectual.

Similarly, when contacted by investigators regarding the letters sent to members of the Alabama Congressional delegation, Patricia Tolbert advised that she had been receiving harassing and threatening letters since 1994.  Beginning in September 2006, she began to receive harassing phone calls.  The most recent phone call occurred on May 13, 2008, and the most recent harassing letter arrived on June 9, 2008.  These letters and phone calls contained racial slurs and death threats.

According to FBI Special Agent David Autrey, the defendant committed the criminal acts in the names of the aforementioned individuals because he believed these individuals had mistreated him in the past.  He related that Nathan Karber was a resident physician in an emergency room where the defendant was a patient and his care did not meet the defendant's expectations.  Yvonne Reid reportedly prescribed the defendant medication to which the defendant had a negative reaction, and as previously noted, David Cooley is her husband.  Regarding Patricia Tolbert, the defendant received a "C" in her trigonometry class.  The white powder found in the letters was a sugar substitute.

On March 9, 2010, an Indictment was filed in the District of Colorado, charging the defendant with four counts of Mailing Threatening Communications in violation of 18 U.S.C. § 876(c) and four counts of False Information and Hoaxes, in violation of 18 U.S.C. § 1038(a)(1). On May 5th, 2010, an Information was filed in the Middle District of Alabama, Southern Division, charging the defendant with three counts of False Information and Hoaxes, in violation of 18 U.S.C. § 1038(a)(1)(A).  On May 10, 2010, a separate Information was filed in the Middle District of Alabama, Northern Division, charging the defendant with three additional counts of False Information and Hoaxes in violation of 18 U.S.C. § 1038(a)(1)(A).  Finally, on August 26,

2010, an Information was filed in the District of Colorado charging the defendant with one count

of Mailing a Threat Against the President in violation of 18 U.S.C. § 871, four counts of Mailing

Threatening Communications in violation of 18 U.S.C. § 876(c), and two counts of Threatening

Communications via Interstate Commerce in violation of 18 U.S.C. § 875(c).

Pursuant to Fed. R. Crim. P. 20, these cases were consolidated in the District of

Colorado, and on August 26, 2010, the defendant appeared with counsel and entered separate

pleas of guilty to the above referenced Informations.  In exchange for the defendant's guilty

pleas to the thirteen counts contained in the Informations, the government agreed to dismiss the

eight-count Indictment and to recommend that he receive a three-point reduction in the offense

level for acceptance of responsibility and timely notification of his intention to plead guilty.

I accepted the guilty pleas after advising the defendant that I was not bound by his

agreement with the government, and that I did not then, and would not until I had received and

studied the Presentence Investigation Report prepared by the court's Probation Department,

know whether I would follow the Sentencing Guidelines in pronouncing his sentence.  Because I

conclude that the Sentencing Guidelines' advice is not persuasive in the circumstances of this

case, I will make specific findings necessary to achieve the purposes of 18 U.S.C. § 3553.  My

reasons for this conclusion are set forth in the balance of this opinion.

### *The U.S. Sentencing Guidelines*

### Guidelines Calculation

I begin by reviewing the Guidelines calculations submitted by the U.S. Probation Office

and ensuring that they are correct.  *See Gall v. United States*, 552 U.S. 38, 49 (2007) (citing *Rita

v. United States*, 551 U.S. 338, 347-348 (2007)).  According to the U.S. Probation Office, the

base offense level for each of the thirteen counts is twelve.  Because each of the offenses resulted in a substantial expenditure of funds to clean up, decontaminate, or otherwise respond to the offense, a four-point enhancement applies.  *See* U.S.S.G. § 2A6.1(b)(2)(A).  And, because the victim of each of the offenses was a government officer or employee and the offense was motivated by such status, an additional three-point enhancement applies.  *See id.* § 2A6.1(b)(4)(B).  The resulting adjusted offense level for each offense is nineteen.  An additional five-point enhancement also applies, because the defendant has been charged with multiple counts.  *See id.* § 3D1.4.  Finally, the offense level is reduced by three points because the defendant accepted responsibility by pleading guilty and waiving his right to trial, resulting in a total offense level of twenty-one.

The defendant objects to the application of the enhancements and contends that his total offense level should be fourteen.  Specifically, the defendant argues that the verified clean-up, decontamination, and response expenses relating to his offenses total $ 3,236.06 – an insubstantial sum which does not justify a four-point enhancement.  The defendant also asserts that he was not motivated by the official status of the recipients of his white powder letters; accordingly, he argues that the three-point enhancement for government victim status is inapplicable.

Both of these arguments are without merit.  Regarding the amount of expenditures relating to the defendant's offenses, these are the verified expenses for only one of the thirteen white powder letters mailed by the defendant. Although the government failed to submit verified expenses for each of the thirteen counts until the day of sentencing, it belies common sense to

suggest that the costs associated with emergency response and clean-up operations for thirteen different white powder envelopes are insubstantial.

The defendant's argument that he was not motivated by the status of the government officials who were the target of his white powder envelopes is similarly meritless. By his own admission, the defendant sent the powder letters to officials as an "experiment" to measure the response his crime generated. More to the point, he sent these threats to government officials to trigger an even greater escalation of harassment against those he falsely labeled as the senders of the threats. Regardless of the dual motives, both rely on the official status of the receiver to accomplish the full effect of his crimes. I accept the Guidelines calculations submitted by the U.S. Probation Office as correct, GRANT the government's Motion for Decrease for Acceptance of Responsibility (doc. 39), and overrule the defendant's objections.

### Applicable Sentencing Range

The maximum term of imprisonment for Counts 1, 6, and 7 in Case Number 10-cr-132 and Counts 1 through 3 in Case Numbers 10-cr-254 and 10-cr- 379 is five years, pursuant to 18 U.S.C. §§ 871, 875(c), and 1038(a)(1)(A) and (c). The maximum term of imprisonment for Counts 2 through 5 in Case Number 10-cr-132 is ten years pursuant to 18 U.S.C. § 876(c). Based on the total offense level of twenty-one and a criminal history category of I, however, the guideline range for imprisonment is 37 to 46 months.

By statute, the defendant is eligible for probation of not less than one nor more than five years. 18 U.S.C. § 3561(c)(1). The Sentencing Guidelines advise, however, that because the applicable guideline range is higher than Zone B of the Sentencing Table, he is not eligible for probation if the Guidelines are followed. U.S.S.G. § 5B1.1(a)(2).

8

The maximum statutory fine is $ 250,000 per count (a total of $ 3,250,000) and the guideline provision is $ 7,500 to $ 3,250,000.  18 U.S.C. § 3571 (2006); 18 U.S.C. § 201(b)(2)(A) (2006); and U.S.S.G. § 5E1.2(c)(3).   Given the defendant's lack of assets, the Probation Department does not recommend a fine.

The Mandatory Victim Restitution Act of 1996 applies, and I must order full restitution pursuant to 18 U.S.C. § 3663A.  I may, however, waive the order for restitution in certain circumstances, but this is not one of them.

With these sentencing provisions in mind, I now turn to the § 3553 factors.

### *§ 3553*

Section 3553's salient purpose is set forth in the first sentence, "The court shall impose a sentence sufficient, but no greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).  Paragraph (2) of Section 3553(a) lists the following purposes:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

With the "nature and circumstances of the offense[s] and the history and characteristics of the defendant" in mind, I have considered each of these factors in determining the appropriate sentence in this case.  18 U.S.C. § 3553(a)(1).

The defendant was charged with, and pled guilty to, sending thirteen threatening letters to various federal government officials as well as the Argentine Consulates in New York and

California.  These letters contained a white, powdery substance (later identified as an artificial sweetener) and references to anthrax.  As a result, response teams treated the substance as a hazardous material; government operations were disrupted and scarce substantial resources were expended to respond safely and appropriately to the threats.  In addition, the individuals who actually opened the letters were placed in fear of their lives and the lives of those around them.

As the defendant acknowledges in his Objection to the Presentence Report (doc. 30), further investigation revealed that his crimes had another, more nefarious element.  The false names and addresses on the packages were actually the names of people the defendant had been harassing for a number of years.  The defendant's campaign of harassment included vulgar and violent communications that disrupted the victims' daily activities and caused genuine fear.  The defendant continued his campaign of harassment by implicating those individuals as the primary suspects for the threatening communication and thus caused them to be subjected to intense scrutiny by law enforcement.

Although not the offense conduct, the impact that the defendant's campaign of harassment has had upon his victims is significant.  This impact is best summarized by the Victim Impact Statement of Nathan and Jill Karber submitted to me in anticipation of the defendant's sentencing.  As the Karbers state, "A ringing phone is terrifying.  A knock at the door is threatening.  An approaching stranger may attack you.  The letter you looked forward to goes unopened.  This is Mr. DeVaughn's legacy.  He is a threat to all of us."  Victim Impact Statement (doc. 33-2) at 8.

Neither the underlying statutes nor the Guidelines contemplate the relationship between the threatening communications with which the defendant is charged and the harassment to

10

which he has subjected his "other" victims.  I think it necessary to fashion a sentence that recognizes that relationship, and as a result depart from the Guidelines to ensure that the defendant's sentence reflects the seriousness of and provides a just punishment for his offenses.

Notwithstanding the seriousness of these crimes, the defendant has moved for a downward departure from the Guidelines based on his history of mental illness.  There is no doubt that this defendant suffers from a recognized mental disorder. He has admitted being treated and medicated for bipolar disorder for a number of years.  He has been diagnosed as such by treating physicians and by both the psychologist and psychiatrist appointed by the court to conduct mental evaluations of him.  Also, he admitted misusing pain prescription medications. He attributes his numerous crimes charged in this case and to which he has pled guilty to this disorder and his failure to continue taking his prescribed medications.

No insanity plea has been tendered in this case, and the evaluations do not suggest that the defendant is not responsible for or unable to understand the wrongfulness of his acts as a matter of law.  Whether his criminal conduct is, in whole or in part, the product of his mental illness does not excuse it.  The issues incident to punishment, deterrence, and protection of the public remain, and the defendant's mental illness must be considered in that context. Accordingly, I DENY the defendant's Motion for Departure (doc. 31).  I have, however, thoroughly considered the defendant's mental illness in crafting a sentence that will protect the public from the defendant while simultaneously facilitating his compliance with the mental health treatment he needs insofar as existing law permits me to so do.

Although the concept of mental illness is often misused as a device for escaping responsibility, such misuse does not invalidate it.  Nor does the misuse of the concept of mental

11

illness mean that it does not provide a deeper understanding of criminal and indeed despicably cruel behavior as committed by this defendant.  There is an equal tendency to misuse both the concepts of crime and mental illness and to confuse and conflate the two.

Until quite recently, that is to say until the turn of the century, the prevailing view of those trained in the behavioral sciences was that crimes perpetrated by the mentally ill were no more common than by the non-mentally ill and that differences between the two categories were primarily based on socioeconomic factors.  Dr. Seena Fazel, *The Line Between Madness and Mayhem*, Wall St. J., January 15, 2011, http://online.wsj.com/article/SB1000142405274 8703583404576080373538042898.html.  Most studies of the criminal behavior of the mentally ill focused on violent crimes.  While this defendant is not charged with offenses usually thought of as violent, such as assault, murder, robbery, or arson, he committed these several offenses with the specific intention of causing considerable harm to individuals and he succeeded in that endeavor.  His methods of inflicting mental pain, financial damage, and embarrassment were devious rather than physically violent, but they were no less depraved, antisocial, and gratuitously harmful.  Accordingly, reference to those studies is neither irrelevant nor inappropriate.

More recent research involving thousands of subjects both in the United States and Europe discloses that as compared to the general public, mentally ill individuals are indeed more likely to commit acts of violence, irrespective of how violence is measured.  *Id.*  The increase in acts of violence shown in these studies was typically two to five times higher.  *Id.*  A 2010 study reviewing the collected data found that subjects with bipolar disorder presented substantially the same risk of violence as those diagnosed with schizophrenia.  *Id.*  Most of these experts agree,

12

however, that a correlation between violence and mental illness does not establish a causal connection between the two. *Id.* Indeed, according to Dr. Seena Fazel, a forensic psychiatrist and academic at Oxford University, substance abuse is a strong factor. "One study in American urban centers," Dr. Fazel writes, "found that nearly a third of patients who were discharged from the hospital and also diagnosed with substance abuse were violent within one year." *Id.* Dr. Fazel continues, "It may be a marker or trigger of destructive personality traits that are inherited or determined by early childhood and family experiences." *Id.*

Little good can be achieved by ignoring a symptom and great harm would be perpetrated by placating a crime. As a society we have a moral obligation to treat mental illness with compassion for those who are afflicted, but we also are subject to a moral imperative to demand individual responsibility for one's deviant and destructive actions. Within this apparent paradox, it is necessary to recognize that symptoms of mental illness can obscure major flaws in character. Stated in a more direct and robust way, unfortunately many people are afflicted with bipolar disorder, but by a wide margin most of them do not engage as this defendant did in aggressive, deviant, and hostile behavior.

In imposing a sentence in this case, I will provide for the treatment of defendant's mental illness, but I will not excuse his conduct or hold him less accountable for it, and I will impose strict conditions in his sentences in order to protect his victims from further outrageous behavior and the public at large from similar criminal acts. Whatever the connection between mental illness and criminality may be, it is clear that to protect the public from further crimes and, indeed, to enhance the defendant's own quality of life, it is essential to prohibit substance abuse, to provide long-term mental health care both in prison and following release, and to require

13

monitoring to ensure to as great an extent possible that the defendant does not stop taking his

medication or abuse prescription medications.  This last factor is especially important when

dealing with offenders who are diagnosed with bipolar disorder because, as demonstrated in this

case, they tend to stop taking medications when their symptoms subside and then revert to the

undesirable behaviors manifested when the symptoms are overt.  *See, e.g.*, Jane Clatworthy,

Richard Bowskill, Tim Rank, Rhian Parham, and Rob Horne, *Adherence to Medication in*

*Bipolar Disorder:  A Qualitative Study Exploring the Role of Patients' Beliefs About the*

*Condition and its Treatment*, 9 Bipolar Disorders 656 (2007).  That is the gaping lacuna in

defendant's assertion that he is no longer a threat.  Neither of the court appointed medical

experts dispute this.  Based on the foregoing, the sentence imposed in this case will provide

specific conditions prohibiting any kind of substance abuse and mandating prolonged mental

health treatment and monitoring of continuing medication for as long as the law allows.  I

believe this will serve the dual purpose of protecting the public, specifically those individuals the

defendant has repeatedly harassed, from the defendant and protecting the defendant from

himself.

As described above, sentencing a defendant with demonstrated mental illness involves a

host of special considerations.  How culpable is the defendant for his crimes?  To what extent

has his judgment been obscured by his mental illness?  What kind of treatment will address the

defendant's underlying illness so as to protect the public best from any future acts of criminality?

These considerations lead me to conclude that, in light of this defendant's culpability and the

need to address the seriousness of his crimes, the defendant should be incarcerated for a

significant period of time.  I also believe, however, that both the public and the defendant would

be served best by an extended period of supervised release to ensure that the defendant receives, and complies with, his mental illness treatment protocol (including medications).

Unfortunately, the statutory provisions as applied to this case are binding yet entirely inadequate to achieve these goals.  Under the Guidelines and the statutory provisions, my primary option for insuring a significant period of supervision is incarceration.[1]  Were I able to sentence without these statutory constraints,  I would prefer to sentence the defendant to 48 months incarceration, to be followed by 20 years of probation and/or supervised release.  There is no dispute that this defendant requires ongoing mental health treatment and mandatory monitoring for compliance.  A 48-month sentence to incarceration would have provided the opportunity for that treatment to take place if it were followed by an extended period of supervision while on probation or release so that the defendant's compliance medication levels could be monitored.  Because of the limitations imposed by statute on probationary sentences and periods of supervised release, the period of incarceration needs to be extended.  That this "Hobson's Choice" adds greatly to the public cost and reduces the efficacy of monitoring

---

[1]  Initially, I intended to sentence the defendant to a period of incarceration to be followed by a period of probation.  This sentence is, however, impermissible under the relevant statutory provisions.  *See* 18 U.S.C. § 3561(a)(3) (directing that a defendant may not be sentenced to probation if he is sentenced at the same time to a period of imprisonment for the same or a different offense).  I further note that the length of a probationary sentence is also limited to five years.  Were I to sentence the defendant to the maximum probationary term for each of the thirteen counts, each sentence is required by statute to run concurrently.  *See id.* at § 3565(b).  And, finally, I note I may only sentence the defendant to a three year period of supervised release.  *See id.* at § 3583(b)(2).  Similar to the limitations on probationary sentences, all periods of supervised release must run concurrently.  *See id.* at § 3624(e).  These limitations significantly curtail discretion and force me, so to speak, to fit a round peg into a square hole in order to achieve my condign objectives.

medications while on release is a consequence of existing law.[2]   In order to achieve my stated

goal, however, I must maximize the period of incarceration, because upon completion of any

period of incarceration, supervised release is statutorily precluded for more than three years.

Faced with the choice of ensuring supervision via incarceration or allowing mentally ill

defendants to leave supervision prematurely, judges are forced to make an unseemly choice with

far-reaching implications.  As recently reported by the Wall Street Journal, "On any given day in

the U.S., the number of people with severe mental illness in prisons is estimated to be three times

higher than the number in hospitals, according to a new report from the Treatment Advocacy

Center and the National Sheriffs' Association."  Dr. Seena Fazel, *The Line Between Madness

and Mayhem*, Wall St. J., Jan. 15, 2011, http://online.wsj.com/article/SB10001424052

7487035833404576080373538042898.html.  As an aside, this problem is not unique to the

sentencing of the mentally ill.  In fact, it is emblematic of the difficulty inherent in attempting to

customize the innately subjective practice of sentencing so as to provide for the public's

protection and the defendant's optimal treatment.  I have, however, done my best to work within

these confines to craft a sentence which reflects my concerns and objectives.

### Sentence

In considering all of the foregoing, the defendant, **JAY STUART DEVAUGHN**, is

hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 24

months on Counts 1 through 7 in Case Number 10-cr-00132; 24 months on Counts 1 through 3

---

[2]  It is ironic that if this defendant were convicted of an enumerated sex offense such as possessing child pornography, he could be placed on supervised release for life.  *See* 18 U.S.C. § 3583(k).

as to Case Number 10-cr-00254; and 24 months on Counts 1 through 3 as to Case Number 10-cr-00379; the terms in each Case to be served consecutively for a total term of 72 months.[3]  I recommend that the Bureau of Prisons designate a Federal Medical Center for service of sentence.  Although in effect the same as sentencing the defendant to 72 months for each count, to be served concurrently, I structure the defendant's sentence in this manner to emphasize his punishment for each instance of criminality and to provide some measure of justice to each of his victims.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years.  This term consists of three years on each of Counts 1 through 7 in Case Number 10-cr-00132; three years on each of Counts 1 through 3 in Case Number 10-cr-00254; and three years on each of Counts 1 through 3 in Case Number 10-cr-00379, all such terms to run concurrently.  Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.  While on supervised release, the defendant shall not commit another federal, state, or local crime, shall not possess a firearm as defined in 18 U.S.C. § 921, and shall comply with the standard conditions that have been adopted by this Court.

As a condition of supervision the defendant shall pay restitution.  I will schedule a hearing in accordance with 18 U.S.C. § 3664(d)(5) to be held within 90 days.  Although suggested, I will not refer this matter to a magistrate judge.  The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a

---

[3]  Pursuant to 18 U.S.C. § 3584, my preceding analysis of § 3553 applies to my decision to order that these sentences run consecutively.

controlled substance and this includes the misuse of prescription medication.  The defendant

shall submit to one drug test within fifteen days of release on supervised release and two periodic

tests thereafter.

The defendant shall cooperate in the collection of DNA as directed by the probation

officer.

In addition, the defendant shall comply with the following special conditions:

1. The defendant shall participate in and successfully complete a program of testing and/or treatment for drug abuse, including prescription medications, as approved by the probation officer, until such time as the defendant is released from the program by the probation officer.  The defendant shall abstain from the use of alcohol or other intoxicants during the course of treatment and shall pay the cost of treatment as directed by the probation officer.

2. The defendant shall participate in and successfully complete a program of mental health treatment, as approved by the probation officer, until such time as the defendant is released from the program by the probation officer.  The defendant shall pay the cost of treatment as directed by the probation officer.  The Court authorizes the probation officer to release to any treatment agency or licensed professional all psychological reports and/or the presentence report for purposes of continuity of treatment.

3. The defendant shall remain medication compliant and shall take all medications and in such amounts and frequency as prescribed by his treating psychiatrist.  The defendant shall cooperate with random blood tests as requested by his treating psychiatrist and/or supervising probation officer to ensure that a therapeutic level of his prescribed medications is maintained.

4. The defendant shall make payment on any restitution obligation resulting from the hearing I will set and that remains unpaid at the commencement of supervised release.  Within 60 days after release from confinement, the defendant shall meet with the probation officer to develop a plan for the payment of restitution.  This plan will be based upon the defendant's income and expenses.  The plan will be forwarded to this court for review and approval.

5.      As directed by the probation officer, the defendant shall apply any monies received from income tax refunds, lottery winnings, inheritances, judgments, sale of assets, and any anticipated or unexpected financial gains to the outstanding court ordered financial obligation in this case.

6.      The defendant shall have no contact at all, directly or indirectly, with the government officials as identified in the counts of conviction, or with Nathan and Jill Karber, Dr. Yvonne Reid, David Cooley, or Patricia and Kelly Tolbert.

7.      The defendant shall reside in a residential re-entry center for a period of up to 180 days, to commence upon release from custody, and shall observe the rules of that facility.

8.      The defendant shall be placed on home detention for a period of 120 days, to commence upon release from the residential re-entry center.  During this period, the defendant shall remain at his place of residence at all times other than time spent at work or time spent on other activities approved in advance by the probation officer.  This period of home detention shall be enforced by electronic monitoring.  To permit this monitoring, the defendant shall maintain a telephone at his place of residence without any special services, modems, answering machines, or cordless telephones.  The defendant shall wear electronic monitoring devices and follow all other procedures specified by the probation officer.  The defendant shall pay the cost of electronic monitoring as directed by the probation officer.

The Mandatory Victims Recovery Act (MVRA), 18 U.S.C. § 3663A, requires the defendant to pay restitution to the victims of his fraudulent conduct.  *See* 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).  The MVRA limits restitution to the victims' actual losses as proven by a preponderance of the evidence.  "Actual losses" only include those losses caused by the offenses for which the defendant has been convicted.  *See United States v. Brewer*, 983 F.2d 181, 183-184 (10th Cir. 1993).  According to the MVRA, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  18 U.S.C. § 3663A(a)(2).  The government has argued, and I agree, that this case

19

presents unique issues relating to restitution, including whether the defendant's "other" victims are eligible for restitution under the MVRA and, if so, which of their expenses are compensable. Accordingly, I defer ruling on restitution pending a hearing on these issues.

The defendant must pay the special assessment fee of $ 1,300 immediately.  Given the recommendation of the Probation Department and the defendant's minimal financial resources, no fine will be imposed.

The defendant is advised of his right to appeal the sentence.  If the defendant desires to appeal, a notice of appeal must be filed with the clerk of court within fourteen days after the entry of judgment or the right to appeal will be lost.  If the defendant is unable to afford an attorney for an appeal, the Court will appoint one to represent him.  If the defendant so requests, the clerk of the court must immediately prepare and file a notice of appeal on his behalf.

The defendant is remanded to the custody of the United States Marshal.

Dated:  January 28, 2011                    BY THE COURT:

                                            **/s/ John L. Kane**

                                            SENIOR U.S. DISTRICT JUDGE